UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENORA LEDBETTER,<br><br>                              Plaintiff,<br>    -against-<br><br>ADVANCE CARE ALLIANCE OF NY, INC.<br><br>                              Defendant. | ECF Case #_____<br><br>**COMPLAINT**<br><br>*Jury Trial Demanded* |

Plaintiff JENORA LEDBETTER ("Plaintiff"), by and through her attorneys, Wagner Berkow & Brandt, LLP, as and for her complaint, respectfully alleges and sets forth as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff brings this action pursuant to 42 U.S.C. § 1981 and New York Executive Law § 296, as amended, seeking damages to redress the injuries suffered as a result of discrimination on the basis of her race, color, ancestry, ethnic characteristics and national origin, by her former employer, Defendant ADVANCE CARE ALLIANCE OF NY, INC.

2. Plaintiff has suffered disparate treatment, disparate impact, adverse employment action, and retaliation at the hands of Defendant, including, but not limited to, a hostile work environment that included exposure to racially insensitive comments, offensive racial stereotyping by a managerial representative of the Defendant on account of Plaintiff's race, color, ancestry, ethnic characteristics and national origin, and unlawful termination following her complaints of discrimination.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345 and 42 U.S.C. § 3614(a).

4. Venue is proper under 28 U.S.C. § 1391(b) because the actions giving rise to Plaintiff's allegations occurred in this district, the subject property is located in this district, and Defendant conducts business in this district.

## THE PARTIES

5. Plaintiff resides in Westchester County, New York, which is within this district.

6. Upon information and belief, Defendant is a non-profit corporation organized and existing under the Not-for-Profit Corporation Law of the state of New York.

7. Upon information and belief, Defendant is exempt from federal income taxation under § 501(c)(3) of the Internal Revenue Code, and operates a non-profit agency for the benefit of developmentally-disabled individuals in Mount Kisco, NY, among other locations, which is located within this district.

## FACTUAL ALLEGATIONS

8. At the relevant times herein, Plaintiff, who is of African-American heritage, was employed by Defendant from October 15, 2018 to September 25, 2020, holding the title of "Director of Care Management."

9. At the relevant times herein, upon information and belief, Lewis Grossman was a representative and managerial level employee of Defendant, who held the title of "Chief Executive Officer."

10. At the relevant times herein, upon information and belief, Kimberley Jaynes was a representative and managerial level employee of Defendant, who held the title of "Vice President of Care Management."

11. At the relevant times herein, upon information and belief, Jennifer Cox was a representative and managerial level employee of Defendant, who held the title of "Senior Director."

12. At the relevant times herein, upon information and belief, Plaintiff's direct supervisor, Holli Rubiano, was a representative and managerial level employee of Defendant who held the title of "Senior Director of Care Management."

13. At the relevant times herein, upon information and belief, Matthew Campoli worked as Plaintiff's subordinate and held the title of "Care Manager Supervisor."

14. Following Plaintiff's termination by Defendant, Mr. Campoli's title was changed to "Assistant Director of Care Management."

15. Plaintiff encountered blatant racial discrimination while employed by Defendant, including being unfavorably compared to her white counterparts based on stereotypical assumptions.

16. Plaintiff was subjected to racially discriminatory comments by Ms. Cox.

17. Plaintiff reported the discriminatory behavior by Ms. Cox to Defendant. Following her complaint on behalf of herself and several members of her team, who submitted separate statements, Ms. Cox was eventually terminated.

18. Following Ms. Cox's termination, Ms. Jaynes began to target Plaintiff with flagrantly discriminatory and retaliatory treatment.

19. For example, Plaintiff was informed by her supervisor, Ms. Rubiano, that Ms. Jaynes had maliciously referred to her as an "angry black woman."

20. Plaintiff was also informed by Ms. Rubiano that Ms. Jaynes wanted to find a reason to terminate Plaintiff's employment.

21. In addition, Ms. Jaynes stereotypically characterized Plaintiff as angry, hostile and threatening when Plaintiff politely and professionally disagreed with accusations about her team.

22. Despite doing nothing wrong, Plaintiff was told by her supervisor, Ms. Rubiano, that Ms. Jaynes had characterized her professional behavior as angry, hostile and threatening, and that Plaintiff should be directed to "tone it down."

23. During the same time period, Ms. Jaynes praised Plaintiff's counterpart, Miranda Kross, who is white, whom Ms. Jaynes referred as a "power-house" and "go-getter," notwithstanding that Ms. Kross conducted herself no better and with no more professionalism than Plaintiff.

24. When Plaintiff pointed out to Ms. Rubiano that it appeared discriminatory that Plaintiff was characterized as threatening and hostile for the same behavior that Ms. Jaynes praised in Ms. Kross, Ms. Rubiano shut down the conversation -- stating that there was nothing she could do about Ms. Jaynes.

25. On September 25, 2019, Plaintiff filed an internal written complaint about discrimination and retaliation at the hands of Ms. Jaynes.

26. In the written complaint, Plaintiff alleged that Ms. Jaynes referred to her as an "angry black woman" and that she had subjected her to other adverse treatment.

27. Following Plaintiff's complaints about Ms. Jaynes, Ms. Rubiano advised Plaintiff that Ms. Jaynes disliked Plaintiff and was searching for a way to terminate Plaintiff's employment.

28. On or about October 15, 2019, Plaintiff was summoned to a meeting with Paul Gordino, former Vice President of Human Resources, and Matthew Smith, former CFO, to be held at the Defendant's principal office in New York City, to discuss her complaint of September 25, 2019.

29. Plaintiff's subordinate at the time, Matthew Campoli, accompanied her to the meeting to corroborate her allegations of discrimination in her complaint. In the meeting, Plaintiff was not asked any questions about her complaint, but instead, was asked about her own performance, which had been exemplary.

30. Approximately one month after the meeting to discuss her complain about Ms. Jaynes, Plaintiff was informed by representatives of the Human Resources department that her allegations had been determined to be "unfounded."

31. Upon information and belief, no disciplinary action was taken by Defendant against Ms. Jaynes, who remained at the top of Plaintiff's line of reporting.

32. On or about June 3, 2020, Plaintiff requested that, in a manner consistent with other organizations, Defendant release a statement in support of the contemporary racial and social justice movement *Black Lives Matter*, which Defendants later did.

33. On or about June 11, 2020, Defendant held a workplace anti-discrimination and sensitivity training session for its employees.

34. Plaintiff and other participating employees complained to Defendant that the individual who led the training session did not appropriately relate to or convey the experiences of people of color because she was not herself a person of color.

35. In or around August 2020, Plaintiff, who was disturbed by Defendant's failure to take her ongoing complaints of discrimination seriously, expressed her fears to Ms. Rubiano that she would be terminated as a result of her complaints.

36. On or about September 10, 2020, Jaime Madden, Chief Administrative Officer, notified certain employees by email, including Plaintiff, that their positions were being eliminated

due to a reduction in force, and that the employees were encouraged to reapply for employment for one or more of the newly-created positions.

37. Shortly following the email from Ms. Madden, Ms. Rubiano held a virtual team meeting with her subordinates.

38. During the virtual call, Ms. Rubiano encouraged everyone to apply for all positions which they found of interest.

39. Plaintiff completed several electronic applications on Defendant's computer system, which allowed for employees to submit multiple employment applications for various positions.

40. Plaintiff applied for the regional Vice President of Care Management, Director of Medicaid Managed Care, Director of Care Management Readiness, and Assistant Director of Care Management, which, upon information and belief, was commensurate with her former position as Director of Care Management and continued to reported directly to her former supervisor, Ms. Rubiano.

41. On September 14, 2020, Sheimonne Rostant, HR Specialist, called Plaintiff to request an interview later that afternoon.

42. Plaintiff asked Ms. Rostant about the position for which she was being interviewed, and Ms. Rostant responded that the interview would cover all positions for which Plaintiff had applied.

43. Ms. Rostant further advised Plaintiff that the calendar invite for the interview would reference the "Vice President of Care Management" position for which she had applied, but that the interview would cover each of the four positions for which Plaintiff had applied.

44. Following the foregoing telephone call, on September 14, 2020, Ms. Rostant sent Plaintiff an email, to which she attached an information sheet about the scheduled interview containing her name, current position, current salary, a list of the four positions for which Plaintiff had applied, and that, after further review, Plaintiff met the qualifications for each of the positions for which she applied and would be interviewed later that day.

45. Later that day, Ms. Madden and Ms. Thorne interviewed Plaintiff, which took place virtually and lasted approximately 15-20 minutes.

46. At the start of the virtual interview, Plaintiff sought confirmation from Ms. Madden and Ms. Thorne that the interview would cover all four positions for which Plaintiff applied, which was confirmed.

47. Ms. Madden and Ms. Thorne explained that they would ask a series of questions, and based on Plaintiff's responses, would choose the position that best suited her skills.

48. However, Plaintiff received an email from Defendant stating that her employment would be terminated as of September 25, 2020.

49. Throughout her employment with Defendant, Plaintiff performed her job functions in a proper and exemplary manner. She did not have a disciplinary record nor were there any complaints about her job performance.

50. Upon information and belief, the newly-titled position of Assistant Director of Care Management had been offered to her former subordinate, Matthew Campoli, who is white, and who is less qualified than Plaintiff.

51. Upon information and belief, the newly-created position of Assistant Director of Care Management reports to Plaintiff's former supervisor, and the job functions are, in substance, equivalent to those of her former position.

52. Plaintiff's credentials are superior to those of her replacement, Matthew Campioli, namely that she obtained her master's degree more than a decade ago and held several years of supervisory experience in the field, while, upon information and belief, her replacement only earned his master's degree within the past few years and held no previous supervisory experience in the field.

53. On September 24, 2020, Plaintiff emailed Defendant's CEO, Lewis Grossman, raising her concerns that an employee with less experience was offered the Assistant Director of Care Management position, "that this decision was a personal one rather than one made fairly based off of work skills and abilities," and that she would like to discuss this with him further. Plaintiff never received a response from Mr. Grossman.

54. Following her complaint to Mr. Grossman, during a telephone call with Defendant's representatives, Plaintiff was offered the position of "Care Manager."

55. The "Care Manager" position was the lowest-level client-care position at Defendant, and was non-supervisory, unlike her former position as Director of Care Manager, which, in substance, amounted to a demotion.

56. Plaintiff declined the offered job, noting that she was overqualified for the position.

57. Upon information and belief, Defendant's employees of color were disparately impacted in the reduction of force as compared to their white counterparts.

58. Plaintiff requested, but was denied, further information from Defendant about the supposed "rating" system that Defendant employed in determining which employees would retain a position and which would be terminated.

59. Upon information and belief, Defendant did not employ an objective rating system to determine which employees would be terminated in the reduction of force based on performance, skill, and ability.

60. Upon information and belief, the termination and retention demographics for the employees who worked in Defendant's Lower Hudson Valley region show a marked disparate impact on the staff members of color.

61. Of the Mount Kisco office's two supervisors, only Plaintiff, who is black and far more experienced than her white replacement, was terminated.

62. Upon information and belief, of the Mount Vernon office, all 12 supervisory staff, who are all persons of color, were discharged, despite that the office has remained open and is manned by replacement staff.

63. Upon information and belief, of the Rockland County office, which was and is staffed by all-white supervisors, no employees were laid off as a result of the reduction in force.

## AS AND FOR A FIRST CAUSE OF ACTION
## (FOR RACIAL DISCRIMINATION UNDER 42 U.S.C. § 1981)

56. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

57. 42 U.S.C § 1981 - Equal rights under the law, provides, in pertinent part:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

58. At all times relevant herein, Defendant practiced, promulgated and enforced a purposefully discriminatory pattern and practice of depriving African-American individuals, including but not limited to Plaintiff, of the equal rights described therein, in violation of 42 U.S.C. § 1981.

59. Defendant intentionally deprived Plaintiff of the same rights as are enjoyed by employees of other races and ethnic groups, to the creation, performance, enjoyment, and all benefits and privileges of their contractual relationships with Defendant, in violation of 42 U.S.C. § 1981.

60. As a result of Defendant's discriminatory actions, in violation of 42 U.S.C. § 1981, as a member of the African-American race, Plaintiff has been denied the enjoyment of all benefits, privileges, terms, and conditions of her contractual relationships, which provided substantial compensation and benefits, thereby entitling her to injunctive and equitable monetary relief; and having suffered such anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendant's actions, thereby entitling Plaintiff to damages.

61. As alleged above, Defendant acted with malice, and willful, wanton, and/or reckless indifference to the rights of Plaintiff, targeting Plaintiff for adverse employment actions based on her African-American heritage, and thereby entitling Plaintiff to an award of punitive damages in an amount not less than $300,000.00.

## AS A SECOND CAUSE OF ACTION

### FOR RACIAL DISCRIMINATION UNDER
### NEW YORK STATE LAW

62. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63. NY Executive Law § 296(1) provides, in pertinent part, that:

It shall be an unlawful discriminatory practice "[f]or an employer or licensing agency, because of an individual's age, race, creed, color, national origin…to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

64. Plaintiff hereby makes a claim against Defendant under all applicable sub-provisions of New York State Executive Law § 296, as amended.

65. Defendant engaged in an unlawful discriminatory practice by terminating and/or taking other adverse employment actions against Plaintiff and otherwise discriminating against Plaintiff based on her race, color, and national origin.

66. Plaintiff is entitled to compensatory damages, consequential damages, back pay, front pay, mental anguish, humiliation damages, and pain and suffering damages, in an amount not less than $350,000.00, as well as an award of reasonable attorneys' fees, expenses, and costs incurred this proceeding and to investigate the facts and claims in this proceeding.

67. As alleged above, Defendant acted with malice, and willful, wanton, and/or reckless indifference to the rights of Plaintiff, targeting Plaintiff for adverse employment actions based on her African-American heritage, and thereby entitling Plaintiff to an award of punitive damages in an amount not less than $300,000.00.

**AS A THIRD CAUSE OF ACTION**

**FOR RETALIATION UNDER
NEW YORK STATE LAW**

68. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

"For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

70. Defendant engaged in an unlawful discriminatory practice by wrongfully retaliating against Plaintiff following her complaints of discrimination.

71. Defendant breached its duty to Plaintiff by intentionally or negligently supervising, failing to supervise, permitting, contributing to, and/or failing to remedy the unlawful conduct committed against Plaintiff, and by retaliating against Plaintiff when it terminated her employment for her complaints of discrimination.

72. Plaintiff is entitled to compensatory damages, consequential damages, back pay, front pay, mental anguish, humiliation damages, and pain and suffering damages, in an amount not less than $350,000.00, as well as an award of reasonable attorneys' fees, expenses, and costs incurred this proceeding and to investigate the facts and claims in this proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter a judgment and order:

A. On the First, Second, and Third, Causes of Action, declaring that the subject practices of Defendant constitute violations of 42 U.S.C. § 1981, and the New York State Human Rights Law;

B. On the First Cause of Action under 42 U.S.C. § 1981, Plaintiff is entitled to compensatory damages, consequential damages, back pay, front pay, mental anguish, emotional distress, humiliation damages, pain and suffering damages, in an amount no less than $300,000.00, as well as an award of reasonable attorneys' fees, expenses, and costs incurred in this action and to investigate the facts and claims in this action.

C. On the Second and Third Cause of Action under the New York Human Rights Law, Plaintiff is entitled to compensatory damages, consequential damages, back pay, front pay, mental anguish, humiliation damages, pain and suffering damages, in an amount no less than $300,000.00 for each individual, as well as an award of reasonable attorneys' fees, expenses, and costs incurred in this proceeding and to investigate the facts and claims in this proceeding. As alleged above, Defendant acted with malice, and willful, wanton, and/or reckless indifference to the rights of Plaintiff, targeting Plaintiff for adverse employment actions based on her African American heritage, and thereby entitling Plaintiff to an award of punitive damages in an amount no less than $300,000.00; and

D. Awarding such other and further relief as this Court may deem appropriate and as may be required in the interests of justice.

## JURY DEMAND

Plaintiff demands a jury trial on all issues to be tried.

Dated: New York, New York
November 23, 2020

        Wagner Berkow & Brandt, LLP

        By: *Ian J. Brandt*
           Ian J. Brandt, Esq.  BR 8511
           462 7th Avenue – 6th Floor
           New York, New York 10118
           (646) 791-2086